

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

| | |
|---|---|
| EAG:MRG/KCB/SMS | *271 Cadman Plaza East* |
| F. #2021R00498 | *Brooklyn, New York 11201* |

April 12, 2022

BY ECF and E-mail

The Honorable Roanne L. Mann
United States Magistrate Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:   <u>United States v. Siyang Chen et. al., 22-CR-158 (ENV) (RLM)</u>

Dear Judge Mann:

The government respectfully submits this letter in support of its application for the entry of a permanent order of detention pending trial for each of the nine defendants charged in the above-referenced case.[1]   The defendants are members or associates of a criminal organization (the "Organization") that, for years, ran a nationwide prostitution business, trafficked women and directed and carried out violent attacks on women throughout the United States to protect its turf and deter commercial sex workers who were working for rival organizations or independently.   In carrying out these attacks, several of the defendants zip-tied victims' hands, stuffed or covered their mouths to silence them, and then viciously beat them with hammers, wrenches, baseball bats and other blunt objects, leaving the victims bloody, terrified, and, in many cases, seriously injured.   The defendants' charged conduct carries substantial penalties—up to life in prison for seven of the defendants—which, along with the defendants' significant risk of flight, makes clear that detention is approach for each.   For the reasons set forth below, each of the defendants should be detained as a danger to the community, a flight risk, or both.

---

[1] Two of the defendants, Meizhen Song and Jilong Yu, were arrested this morning in the Northern District of Texas, where the government will be seeking detention as to them.   One of the defendants, Carlos Cury, is in state custody on pending state charges and will be transferred to federal custody tomorrow morning.

I.      Background and Relevant Facts

Since at least 2019, the Organization has operated a sex trafficking and interstate prostitution business throughout the United States, headquartered in Queens, New York.   The Organization's activities encompassed organizing sites for commercial sex work throughout the country, arranging money pick-ups from its commercial sex workers, connecting sex workers with dispatchers who took in calls from customers, and recruiting additional sex workers—targeting women without legal status in the United States.   The Organization controlled its business territory and its sex workers through violence.

The lowest members of the Organization participated in assaults of women believed to be engaging in prostitution independently or for rival organizations—some of whom previously worked for the Organization.   Individuals were able to rise up in the Organization to take on other responsibilities.   For example, defendants Rong Rong Xu, Siyang Chen and Jiarun Yan all initially conducted violent assaults of women (detailed below) before taking on other roles, such as providing instructions to others about performing the attacks, in addition to conducting other activities with respect to the prostitution business, including setting up locations from which the business would operate.

Defendants Xu, Bo Jiang, Siyang Chen, Meizhen Song and Jilong Yu all undertook managerial roles in the Organization, including recruiting individuals and relaying instructions for carrying out attacks.   Defendants Xu, Siyang Chen, Yu, Yan, Siyu Chen and Carlos Cury all physically participated in assaults.   Defendant Zerong Tang communicated with, arranged locations for and conducted money pick-ups from commercial sex workers, as did many of the other defendants.   Moreover, members of the Organization, including defendants Siyang Chen, Jiang, Song, Xu, Yan, Yu and Tang, engaged in a money laundering conspiracy to promote the Organization's business and, in some cases, to conceal its proceeds.

A.      Assaults and Robberies of Women Across the United States

The defendants, acting on behalf of the Organization, conducted more than fifteen violent assaults of commercial sex workers, perceived to be working for rivals, throughout the United States.   Between at least January 8, 2020 and September 1, 2021, the Organization, including Siyang Chen, Siyu Chen, Jiang, Song, Xu, Yan, Yu and Cury, agreed to commit, ordered and carried out a series of violent assaults and robberies of women engaged in prostitution, where the perpetrators of the assaults and robberies violently attacked their victims and stole prostitution proceeds and cellular telephones from the victims—the latter in an attempt to learn information about rival organizations.   The victims of these assaults and robberies were largely Chinese women staying in hotels providing commercial sex services to clients.   They were frequently restrained by zip ties or thick tape and then beaten with a blunt object, often a hammer or wrench.   The perpetrators of these robberies and assaults posed as potential clients of the victims or arrived unannounced at the victims' hotel room doors.

The Organization committed assaults, robberies and attempted robberies on or about the following dates and locations, among others:

- **January 8, 2020 (Beaverton, Oregon)**: committed by Xu and Yan, using black duct tape and a baseball bat, resulting in the victim's losing consciousness and suffering serious bruising;

- **March 20, 2020 (Overland Park, Kansas)**: committed by Siyang Chen and Yan, using zip ties and a baseball bat or wood stick, resulting in the victim's suffering serious bruising and long-term pain;

- **September 28, 2020 (Omaha, Nebraska)**: committed by Xu, Siyu Chen and a co-conspirator, using a rolling pin;

- **October 5, 2020 (Midland, Texas)**: committed by Siyu Chen and a co-conspirator, at the direction of Jiang, Song and Xu, using black duct tape and a baseball bat, resulting in the victim's losing consciousness and suffering serious bruising;

- **October 9, 2020 (Omaha, Nebraska)**: committed by Xu and a co-conspirator, at the direction of Song, using zip ties and a metal rod, resulting in the victim's bleeding from her face, sustaining a serious eye injury and long-term vision issues and experiencing pain;

- **October 24, 2020 (Portland Oregon)**: committed by co-conspirators, at the direction of Siyang Chen, Jiang, Song and Xu, using zip ties;

- **October 26, 2020 (Omaha, Nebraska)**: committed by co-conspirators, at the direction of Siyang Chen, Jiang, Song and Xu, using zip ties and a hammer;

- **November 5, 2020 (Portland, Oregon)**: committed by co-conspirators, at the direction of Siyang Chen, Jiang and Xu, using zip ties and a hammer, resulting in the victim's being wheelchair bound following the assault before regaining a reduced ability to walk;

- **November 5, 2020 (Portland, Oregon)**: committed by co-conspirators, at the direction of Siyang Chen, Jiang and Xu, using zip ties and a hammer, resulting in the victim's six-week hospital stay and being wheelchair bound for several months;

- **November 16, 2020 (Overland Park, Kansas)**: committed by co-conspirators, at the direction of Jiang and Xu, using zip ties and a hammer, resulting in the victim's not being able to walk for approximately six months;

- **November 24, 2020 (Southfield, Michigan)**: committed by co-conspirators, at the direction of Jiang, Xu and Yu, using a hammer, resulting in the victim's serious bruising to the face and body;

- **November 25, 2020 (Beaverton, Oregon)**: committed by co-conspirators, at the direction of Jiang, Xu and Yu, using zip ties and a hammer, resulting in the victim's fracturing a bone and suffering deep cuts and significant pain;

- **December 6, 2020 (Southfield, Michigan)**: committed by co-conspirators, at the direction of Jiang, Xu and Yu, using zip ties and a hammer, resulting in the victim's swollen eyes, bruising and bleeding;

- **May 25, 2021 (Overland Park, Kansas)**: committed by Cury, using duct tape and a stun gun;

- **September 1, 2021 (Overland Park, Kansas)**: committed by Cury, using a stun gun, resulting in the victim's loss of consciousness.

WeChat messages reveal the steps the defendants took to plan these assaults, and outline the violence that occurred during the assaults, in excruciating detail—including the circulation of videos of the assaults between the defendants to prove to more senior members of the Organization that the beatings were sufficiently severe.   The videos depict victims screaming and struggling while they are bound, bleeding and being beaten with hammers, among other weapons.   After reviewing the videos, certain of the defendants grew frustrated that attacks were not even more "vicious," and Jiang, among others, chastised the enforcers and demanded increasingly violent and aggressive assaults.

In many cases, the defendants' own words demonstrate their guilt and dangerousness to the community.   As just one example, on October 4, 2020, Song and a co-conspirator exchanged a number of messages regarding an upcoming attack in Texas, including messages regarding purchasing the items needed for the attack, namely zip ties and an iron wrench, as well as instructions.   For example, Song wrote, "This time remember the video, money, video and money!   Video and Money!!!!!"   She also wrote, "Hold on to the money you rob."   The night before the attack, Song shared a screenshot of a WeChat message she received from Jiang with instructions on the upcoming assault:

> Beat [her] to death tomorrow.   If she dares fight back, beat her more viciously.
> Get some results from the beating.   The money [i.e., the cost of sending enforcers to conduct assaults] can't be thrown away for nothing.   If there's time, make sure you rob her of the phone, passport and money, three things.[2]

Jiang then urged Song to speak to the enforcers: "[w]e can't throw money away. . . .   We spent about $3,000 in total last time," again referring to the cost of conducting a previous assault.   The following day, on October 5, 2020, in a group WeChat, Xu provided instructions to the Organization's enforcers on how to conduct an attack:

> [I]t's different this time, we won't tie her hands.   One person choke her by her throat, the other person strike her four limbs to death.   Definitely don't make a sound.   Beat her to the point where she can't fight back.   After that, take her

---

[2] As with all WeChat messages cited herein, the above is a draft translation of a WeChat message reviewed pursuant to a judicially-authorized search warrant.   WeChat is a Chinese multi-purpose instant messaging and social media application where users can message one another individually or in group chats.

cellphone and leave.

Later that day, the defendant Siyu Chen, at the direction of Jiang, Song and Xu, assaulted a commercial sex worker in Midland, Texas.   At approximately 2:58 p.m., Siyu Chen sent a video to the group, in which an individual is pictured hitting a woman with his fist.   Xu responded, "not enough, take the hammer.   Can't cause injury like this."   Song then responded, "not vicious enough.   Need to prevent [her] from working a week."   The next day, Song sent a series of messages, which together read, "[t]he person went back to work.   The beating didn't work."   Song continued, "The beating you guys did wasn't vicious enough.   I don't know what that hammer was for. . . ."   Following that attack, the Organization determined that its enforcers needed to learn from Xu "what's considered acceptable," i.e., a sufficiently severe beating. Specifically, Song wrote to a co-conspirator, "[t]his time you go there alone and then the sister from last time will also go there.   You tie up the person.   That sister will do it.   She'll teach you what's considered acceptable.   You just need to protect her."   Song then sent the co-conspirator flight information.   Following an attack on October 9, 2020, the Omaha Police Department recovered a latent print from the crime scene that a forensic examiner later identified as originating from Xu.

The WeChat messages also make clear that the Organization's aim was to protect its turf and establish its dominance to enrich its members.   On October 25, 2020, in advance of an assault the following day, Xu instructed the enforcers by WeChat: "[w]hen you do the beating this time, remember to say, whichever fucking hotel the girls move to, you will follow them there.   Looking for death.   then you say 'Your boss knows that I beat people here, but still sends you here.   Don't want your life anymore.'"   As another example, on November 5, 2020— a day on which the Organization orchestrated two back-to-back assaults in Portland, Oregon— Jiang sent the following instructions:

> It's more important for you to beat them on the legs.   Having spent so much money, I want to see some results.   Everyone wants to make money.   I have you guys do these to make my business better . . . . Go for the legs during the beating. It's useless to hit the faces.   It looks bad but they can continue to work after the swelling goes down.

The Organization took a broad view of its "turf" and went to increasingly violent lengths to protect it.   On November 25, 2020, responding to a photograph of the exterior of the Beaverton Extended Stay, where a woman would be violently assaulted only a short time later, Xu wrote:

> I've done a beating in this hotel before.   The sounds insulation is especially poor. Remember to put the TV on and sound in the bathroom . . . . Remember to warn that girl this is the boss's turf.   If she comes again, her legs will be taken off.

In advance of the December 6, 2020 assault, Jiang put the business plan in plain terms—to chase rivals away from the Organization's territory so that the Organization would profit.   Specifically, Jiang sent a number of messages emphasizing the necessity of the trip "because it was decided, we already sent a girl there.   If the beating isn't done, the girl won't have any jobs.   There will be many problems."

Finally, the defendants also used the WeChat as a recruiting tool, as well as to increase their own power and prestige within the Organization.   For example, Song wrote to a co-conspirator that she had recruited after he committed an assault and robbery of a commercial sex worker, "I'll ask them if they gave you the money for me . . . . Because they told me that you would get 500 and I get 200 . . . . Otherwise why am I so enthusiastically looking for people." As another example, on December 9, 2020, in discussing participants for an upcoming assault and robbery, Yu informed a co-conspirator that Yu "want[ed] to know if you guys can go on the 13th and how long can you go for.  Because there may be beatings in two different locations."  Yu also sought to recruit a "Mexican friend" to commit assaults after women in certain locations became suspicious of Asian male customers following the series of assaults described above.   Yu wanted to bring a new person on quickly, the "sooner the better," even suggesting that the co-conspirator bring that friend to the next assault to "get a practice in."  On December 14, 2020, a co-conspirator asked Yu why he was not a participant in the group chat, to which Yu responded, "I'll tell you later," and then, "[i]n reality, I'm still in charge."

B.    The Interstate Prostitution Business

As described above, the Organization has run a wide-ranging interstate prostitution business.   Using WeChat messages and avoiding in-person meetings, members of the Organization provided commercial sex workers with operational instructions, including specific geographic locations from which to work, how much to charge customers and how to interact with customers.   The Organization generally paid for the cost of the hotel or lodging where the women operated, but all other costs, including airfare, were typically paid for by the workers.   Once a woman arrived at the specified hotel or residence, the prostitution business operated predominantly through a WeChat message group, which included, at a minimum, the woman, a dispatcher who communicated with the customers and a member of the Organization, who the woman believed to be the "boss."   The Organization received approximately half of the money earned from the woman for each client, and it arranged for the money to be collected through a variety of means, including couriers, RMB[3]-USD exchanges and pick-ups after the woman returned to Queens, New York.

In addition to witness testimony, there is ample documentary evidence of this scheme.   For example, documents recovered from a judicially-authorized search warrant of Xu's iCloud contained a four-page Microsoft Word document, dated December 7, 2019, and titled "Standard Precautions in Dispatching," containing a series of instructions for phone dispatchers handling calls from customers seeking sexual services.[4]   Among other things, the document advises dispatchers how to document customer orders, how to screen customers and how to respond to difficult customers.   The document concludes with an instruction to the dispatchers to report any issues to "me or CHEN SIYANG," i.e., Siyang Chen, where "me" appears to refer to Xu.   The document refers to the two of them as "high management" later in the same paragraph.   In addition, law enforcement recovered a document containing a list of apartment

---

[3] The renminbi (RMB) is the official currency of the People's Republic of China.

[4] The document is in Mandarin.   The following is based on a draft translation of the document.

6

units leased by the Organization, many of which have been independently linked by local enforcement to prostitution activity.   Specifically, the list included apartments located in Beaverton, Oregon; Omaha, Nebraska; and Honolulu, Hawaii—all locations where the Organization operates.   Law enforcement has identified leases entered into by the Organization throughout the country for the purposes running an interstate prostitution business.

C.    Sex Trafficking Conspiracy

The Organization also sought to control women engaging in commercial sex work for the Organization through force, fraud and coercion.   For example, in a group WeChat, on October 25, 2020, Xu directed an enforcer to tell a commercial sex worker that:

if any girls leave the boss to work on her own, the boss here will beat her to death. you can say that your friend was a customer and heard the girls say that.

To ensure that the women continued to serve as sex workers for the Organization, the Organization arranged for certain women who tried to work on their own or with the assistance of rival organizations to be brutally assaulted and robbed.   The Organization also made sure that the assaults were well publicized, including to the women who worked for the Organization, to ensure that they continued to work for the Organization and to adhere to the Organization's rules.   In addition, members of the Organization often required the women to provide copies of their identification documents before they commenced commercial sex work for the Organization as another means by which the Organization maintained control over the women.   The evidence in this case shows that through these methods, the Organization compelled and attempted to compel women to work for the Organization or face violent consequences.

For example, one victim ("Victim-1") is expected to testify that when she began working for the Organization, she was required to provide a copy of her passport at the outset. She feared what would happen to her family if she did not comply with the Organization's directives, since the Organization now had her personal information, including where in China she was from (and where her family still resided).   When Victim-1 ultimately decided not to work for the Organization and instead work on her own, she was viciously assaulted.   Similarly, when another victim ("Victim-2") began working for the Organization, Siyang Chen took her passport.   Victim-2 subsequently had a dispute with Siyang Chen when she did not do what he told her, and then confided to a dispatcher that she would never work for the Organization again once she finished the trip.   A few days later, she was brutally assaulted by Yan and Xu.

Moreover, over 300 images relating to commercial sex work, including photos of women who appeared to be posing for escort advertisements, were recovered from Xu's iCloud account.   When conducting an Internet search, law enforcement found many of those images on Megapersonals.com, a website that is frequently used to advertise commercial sex services. There were also photographs of women posing with their passport or other identification document held up next to them, as well as photographs of customers, including customers posing in front of hotels.

D.     Money Laundering Conspiracy

        The defendants and other members of the Organization also transferred money to fund the operations of the interstate prostitution and trafficking enterprise and distribute proceeds of the prostitution business and robberies to enrich the Organization's members.   With respect to certain transactions, members of the Organization transferred money with the purpose of concealing the nature and ownership of the source of funds.   The defendants would collect money from women engaging in prostitution directly or by having other members of the Organization pick up the money in person, and the Organization would then use those illicit proceeds to continue to reinvest in its trafficking and interstate prostitution activities, pay individuals to commit assaults and robberies, pay higher ranking members of the Organization or wire the money to Organization-controlled accounts.

        The Organization has significant financial means.   For example, law enforcement has identified numerous bank accounts that are believed to be used to collect proceeds of the Organization's prostitution-related activity.   Some of the accounts are under the names of others, presumably in an effort to disguise the ownership or control of the illicit proceeds. During the relevant period, more than $750,000 was deposited into those accounts, including by various members of the Organization, as detailed in bank records and captured on bank video surveillance footage, such as Siyang Chen, Xu, Yan and Tang.

        In addition to collecting proceeds, these accounts also are used to pay for the Organization's unlawful activities.   During the relevant period, more than $120,000 was withdrawn from the above-referenced accounts.   During the same time, the Organization booked over 140 domestic flights to locations where the Organization is known to operate, including in Hawaii, Kansas, Michigan, Missouri, Nebraska, New Hampshire, Oregon, Texas and Washington.   The Organization also used these accounts to book or rent dozens of hotel rooms and apartments across various states.   In connection with these transactions, the Organization frequently used other names and identifying information, including fraudulent identity documents, in an effort to evade law enforcement detection.

II.     The Defendants' Charged Crimes, Criminal Histories and Additional Relevant Information

        A.     Siyang Chen

        Siyang Chen is charged in the Indictment with one count of racketeering conspiracy, in violation of 18 U.S.C. §§ 1962(d) and 1963; one count of sex trafficking conspiracy, in violation of 18 U.S.C. § 1594(c); one count of interstate prostitution conspiracy, in violation of 18 U.S.C. § 371; one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); one count of interstate prostitution, in violation of 18 U.S.C. § 2422(a); one count of Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951; one count of distribution of proceeds of a prostitution business, in violation of 18 U.S.C. §§ 1952(a)(1) and 1952(b)(1); and one count of assault with a dangerous weapon in-aid-of racketeering, in violation of 18 U.S.C. § 1959(a)(3).

8

Chen, a Chinese citizen, is a legal permanent resident of the United States.   Prior to the onset of the COVID-19 pandemic, Chen traveled to China and spent approximately five months overseas in 2018 and 2019.   Chen also traveled domestically by air more than 20 times in connection with Organization-related activities, including assaults like the ones referenced above.   In addition to his ties abroad and extensive domestic travel, Chen has significant financial means via bank accounts that law enforcement knows belong to, or are used by, members of the Organization, including the above-referenced accounts with over $750,000 in deposits during the relevant period.   Two of those accounts are held in Chen's name, which account for approximately $236,000 of the total.

B.   Siyu Chen

Siyu Chen is charged in the Indictment with one count of racketeering conspiracy, in violation of 18 U.S.C. §§ 1962(d) and 1963; one count of sex trafficking conspiracy, in violation of 18 U.S.C. § 1594(c); one count of interstate prostitution conspiracy, in violation of 18 U.S.C. § 371; one count of Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951; one count of assault with a dangerous weapon in-aid-of racketeering, in violation of 18 U.S.C. § 1959(a)(3); and one count of access device fraud, in violation of 18 U.S.C. §§ 1029(a)(5) and 1029(c)(1)(A)(ii).

Chen, a Chinese citizen, does not have legal status in the United States, after entering the country legally but subsequently violating the terms of his conditional immigration status.

C.   Carlos Cury

Cury is charged in the Indictment with one count of interstate prostitution conspiracy, in violation of 18 U.S.C. § 371; one count of Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951; and one count of Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a).   Cury has been the subject of three bench warrants in New York, including most recently in February 2022 in a Queens County felony mischief case, as well as a bench warrant in Missouri for failure to appear on felony controlled substance charges.   He is presently in custody pending state charges.

D.   Bo Jiang

Jiang is charged in the Indictment with one count of racketeering conspiracy, in violation of 18 U.S.C. §§ 19962(d) and 1963; one count of sex trafficking conspiracy, in violation of 18 U.S.C. § 1594(c); one count of interstate prostitution conspiracy, in violation of 18 U.S.C. § 371; one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); one count of Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951; one count of distribution of proceeds of a prostitution business, in violation of 18 U.S.C. §§ 1952(a)(1) and 1952 (b)(1); three counts of assault with a dangerous weapon in-aid-of racketeering, in violation of 18 U.S.C. § 1959(a)(3); three counts of assault with a dangerous weapon and resulting in serious bodily injury in-aid-of racketeering, in violation of 18 U.S.C. § 1959(a)(3); and one count of access device fraud, in violation of 18 U.S.C. §§ 1029(a)(5) and 1029(c)(1)(A)(ii).

Jiang, a Chinese citizen, is a legal permanent resident in the United States.   Jiang committed the charged offenses while serving a two-year probationary sentence, between April 2019 and May 2021, in connection with a forgery-related conviction in New York County.   Jiang has also been the subject of a prior bench warrant in Nassau County, New York in a case involving possession of forged documents.

E.    Meizhen Song

Song is charged in the Indictment with one count of racketeering conspiracy, in violation of 18 U.S.C. §§ 19962(d) and 1963; one count of sex trafficking conspiracy, in violation of 18 U.S.C. § 1594(c); one count of interstate prostitution conspiracy, in violation of 18 U.S.C. § 371; one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); one count of Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951; one count of distribution of proceeds of a prostitution business, in violation of 18 U.S.C. §§ 1952(a)(1) and 1952(b)(1); two counts of assault with a dangerous weapon in-aid-of racketeering, in violation of 18 U.S.C. § 1959(a)(3); and one count of access device fraud, in violation of 18 U.S.C. §§ 1029(a)(5) and 1029(c)(1)(A)(ii).

Song, a Chinese citizen, is currently in removal proceedings, after she violated the terms of her conditional entry into the United States.   Song was arrested in or around July 2020 after she was caught using a fraudulent credit card in a retail establishment and presented a fraudulent Maryland identification card to law enforcement, showing a false name and date of birth.   On April 5, 2021, Song was sentenced to two years' probation after pleading guilty to one count of access device fraud and one count of identity theft.

F.    Zerong Tang

Tang is charged in the Indictment with one count of interstate prostitution conspiracy, in violation of 18 U.S.C. § 371; one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); and one count of distribution of proceeds of a prostitution business, in violation of 18 U.S.C. §§ 1952(a)(1) and 1952 (b)(1).

Tang, a Chinese citizen, does not have legal status in the United States, after entering the country legally and violating the terms of his conditional immigration status.   Tang has significant financial means via bank accounts that law enforcement knows belong to, or are used by, members of the Organization, including the above-referenced accounts with over $750,000 in deposits during the relevant period.   One of those accounts is in Tang's name and accounts for approximately $30,000 of the total.

G.     Rong Rong Xu

Xu is charged in the Indictment with one count of racketeering conspiracy, in violation of 18 U.S.C. §§ 19962(d) and 1963; one count of sex trafficking conspiracy, in violation of 18 U.S.C. § 1594(c); one count of interstate prostitution conspiracy, in violation of 18 U.S.C. § 371; one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); one count of distribution of proceeds of a prostitution business, in violation of 18 U.S.C. §§ 1952(a)(1) and 1952(b)(1); two counts of interstate prostitution, in violation of 18 U.S.C. § 2422(a); one count of Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951; six counts of assault with a dangerous weapon in-aid-of racketeering, in violation of 18 U.S.C. § 1959(a)(3); three counts of assault with a dangerous weapon and resulting in serious bodily injury in-aid-of racketeering, in violation of 18 U.S.C. § 1959(a)(3); and one count of access device fraud, in violation of 18 U.S.C. §§ 1029(a)(5) and 1029(c)(1)(A)(ii).

Xu, a naturalized U.S. citizen born in China, has significant ties abroad and financial means.   Prior to the onset of the COVID-19 pandemic, Xu traveled internationally 11 times between 2016 and 2019, including five trips to China.   Xu also traveled domestically by air more than 15 times in connection with Organization-related activities, including assaults like the ones referenced above.   In addition to her ties abroad and extensive international and domestic travel, Xu has significant financial means via bank accounts that law enforcement knows belong to, or are used by, members of the Organization, including the above-referenced accounts with over $750,000 in deposits during the relevant period.   Four of those accounts are held in Xu's name and account for approximately $300,000, or half, of the total.

H.     Jiarun Yan

Yan is charged in the Indictment with one count of racketeering conspiracy, in violation of 18 U.S.C. §§ 1962(d) and 1963; one count of sex trafficking conspiracy, in violation of 18 U.S.C. § 1594(c); one count of interstate prostitution conspiracy, in violation of 18 U.S.C. § 371; one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); one count of distribution of proceeds of a prostitution business, in violation of 18 U.S.C. §§ 1952(a)(1) and 1952(b)(1); two counts of interstate prostitution, in violation of 18 U.S.C. § 2422(a); one count of Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951; and two counts of assault with a dangerous weapon in-aid-of racketeering, in violation of 18 U.S.C. § 1959(a)(3).

Yan, a naturalized United States citizen born in China, has significant ties abroad and financial means.   Prior to the onset of the COVID-19 pandemic, Yan traveled to China twice.   Yan also traveled domestically by air more than a dozen times in connection with Organization-related activities, including assaults like the ones referenced above.   In addition to his ties abroad and international and domestic travel, Yan has significant financial means via bank accounts that law enforcement knows belong to, or are used by, members of the Organization, including the above-referenced accounts with over $750,000 in deposits during the relevant period.   One of those accounts is held in Yan's name and accounts for approximately $76,000 of the total.

I.      Jilong Yu

Yu is charged in the Indictment with one count of racketeering conspiracy, in violation of 18 U.S.C. §§ 19962(d) and 1963; one count of sex trafficking conspiracy, in violation of 18 U.S.C. § 1594(c); one count of interstate prostitution conspiracy, in violation of 18 U.S.C. § 371; one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); one count of distribution of proceeds of a prostitution business, in violation of 18 U.S.C. §§ 1952(a)(1) and 1952(b)(1); one count of Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951; three counts of assault with a dangerous weapon in-aid-of racketeering, in violation of 18 U.S.C. § 1959(a)(3); and one count of access device fraud, in violation of 18 U.S.C. §§ 1029(a)(5) and 1029(c)(1)(A)(ii).

Yu, a Chinese citizen, is a legal permanent resident in the United States.

III.    Legal Standard

The court "shall order" a defendant detained if it finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e)(1).  The government bears the burden of persuading the court by a preponderance of the evidence that the defendant is a flight risk or by clear and convincing evidence that the defendant is a danger to the community. United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001).  In addition, a court may order detention if there is "a serious risk that the [defendant] will . . . attempt to obstruct justice, or . . . threaten, injure, or intimidate, a prospective witness or juror."  18 U.S.C. § 3142(f)(2)(B).  A finding of a risk of obstruction of justice must be supported by a preponderance of the evidence. United States v. Madoff, 586 F. Supp. 2d 240, 247 (S.D.N.Y. 2009) (preponderance of evidence standard applies to determination of risk of obstruction of justice).

The government may proceed by proffer to establish facts relevant to a detention determination.  United States v. Ferranti, 66 F.3d 540, 541 (2d Cir. 1995).  Furthermore, "[t]he rules of evidence do not apply in a detention hearing."  Id. at 542.  As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross examination.  Most proceed on proffers.  See United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000). This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery."  United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly in LaFontaine, 210 F.3d at 131).  Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence.  Id.

United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004).

Whether detention is sought on the basis of flight or dangerousness, the Bail

Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, "including whether the offense is a crime of violence . . . or involves a . . . firearm"; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including "whether, at the time of the current offense or arrest, the person was on probation [or] on parole"; and (4) the seriousness of the danger posed by the defendant's release.  See 18 U.S.C. § 3142(g).  Specifically, in evaluating dangerousness, courts consider not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'"  United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

IV.   Argument

No bail package will protect the community from the danger posed by the defendants.   Each of the defendants were members or associates of a violent criminal organization whose activities furthered that organization's aims.   Clear and convincing evidence demonstrates that the defendants (apart from Tang) pose a danger to the community.   The defendants, including Tang, are also considerable flight risks given the prospect of facing significant prison sentences—up to life—should they be convicted after trial.   And numerous of the defendants' access to cash and ties to foreign countries indicate that they have the means to flee and help others do the same.   For these reasons, and for those articulated below, all the Section 3142(g) factors counsel in favor of the defendants' detention pending trial.

A.   Nature of the Crimes Charged

The nature and circumstances of the charged crimes are extremely serious.   All of the defendants, apart from Tang, are charged with crimes of violence and crimes that involve dangerous weapons, including hammers and baseball bats.   See 18 U.S.C. § 3142(f)(1). Indeed, Xu, Yan, Siyang Chen, Siyu Chen, Jiang, Song, Yu and Cury are all alleged to have participated in or orchestrated vicious attacks against women on behalf of the Organization. The violent conduct alleged in the Indictment—in addition to activity underlying the sex trafficking conspiracy and interstate prostitution charges, in which Tang was also a participant— was highly coordinated, spanned years, and was, on its face, incredibly serious, strongly weighing in favor of detention.

B.   The Weight of the Evidence

The weight of the evidence against the defendants is overwhelming.   As described above, numerous of the defendants—Song, Jiang, Siyang Chen, Xu, Yu, and Siyu Chen—exchanged WeChat communications with one another, in which they explicitly   planned for the violent assaults and robberies described above, and encouraged increasingly vicious beatings of the victims.   For example, as detailed above, Song used WeChat to recruit others to participate in assaults and, in one WeChat message, informed a co-conspirator that she was "laughing [her] ass off," after she "heard that it was pretty strenuous for you to hold her down"— referencing a victim who had tried to escape one of the attacks.   Jiang encouraged Organization members to "[b]eat [one of the victims] to death tomorrow.   If she dares fight back, beat her more viciously."   In another conversation, Jiang instructed, "Go for the legs during the beating.

13

It's useless to hit the faces.   It looks bad but they can continue to work [i.e., for a rival prostitution organization] after the swelling goes down."   When Siyu Chen informed other Organization members via WeChat that he had obtained a hammer for one of the assaults, Xu responded, "good boy," and then instructed, "One person choke her by her throat, the other person strike her four limbs to death."   And Yu discussed beatings over WeChat, suggesting that co-conspirators bring others along to the beatings to "get a practice in."   Certain of the assaults were also captured on video, evidencing the extraordinary violence embraced by the Organization.   In addition, among other things, cell site location data places defendants Siyang Chen, Xu, Yan and Cury in the vicinity of several of the attacks against women described above.

Even more of the Organization's members and associates, including Tang, used WeChat to coordinate the day-to-day business of the Organization's interstate prostitution ring. Moreover, travel records, including flight, hotel and rental car reservations, telephone records, police and first responder reports, crime scene evidence, email communications, receipts, financial records, wire transfers, surveillance and CCTV footage and witness testimony all variously corroborate the defendants' participation in these attacks.

C.   The Defendants' History and Characteristics

The defendants' history and characteristics also weigh heavily in favor of detention.   As an initial matter, many of the defendants have a place to flee to—China—and the means and motive to do so.   Siyang Chen, Siyu Chen, Jiang, Song, Tang and Yu are all citizens of China.   Moreover, several of the defendants have traveled frequently to China in recent years, including Siyang Chen, Rong Rong Xu and Jiarun Yan.   No conditions could ensure the defendants' return to court in this case.   See, e.g., United States v. Baig, 536 F. App'x 91, 93 (2d Cir. 2013) (affirming detention order in part because the defendant "though a permanent resident of the United States, is a citizen of Pakistan and maintains ties there") (citing United States v. Mercedes, 254 F.3d 433, 438 (2d Cir. 2001) (reversing district court's grant of bail where defendant was a permanent resident of the United States and had consented to electronic surveillance and home monitoring)); United States v. El-Hage, 213 F.3d 74, 80 (2d Cir. 2000) (noting that a defendant's "history of travel and residence in other countries" as one that has been long-approved by the Second Circuit in determining whether a defendant should be detained).

The defendants also have ample reason to flee.   Siyu Chen, Song and Tang are all present in the United States without legal status.   And the defendants now face up to twenty years per count (for Tang and Cury) or life imprisonment (for the remainder of the defendants) on serious federal racketeering and related charges.[5]   And all of the defendants, as members or associates of the Organization, have the means to flee.   As detailed above, hundreds of thousands of dollars have flowed through bank accounts associated with the Organization, including through shell companies.   The amounts traveling through these accounts are more than enough to pay for plane tickets for the defendants and to finance their flight from justice.

This risk of flight is only exacerbated by the Organization's demonstrated efforts

---

[5] Attached to this memorandum is an appendix outlining the charges by defendant, including the applicable maximum terms of imprisonment as to each.

to evade detection and disguise the true nature of their identities and conduct by, for example, using aliases or others' personal identifying information, in booking lodging and airfare associated with illicit conduct, including the vicious assaults described above.   As the Second Circuit recently concluded, risk of flight alone, when coupled with incentives to flee and ties to another country, can warrant detention, regardless of whether a defendant is able to offer an impressive bail package and agree to elaborate conditions of pre-trial release.   See United States v. Boustani, 932 F.3d 79, 82 (2d Cir. 2019) (affirming detention based on flight risk alone, based in large part on the white-collar charges against him and the incentive and means to flee).

Finally, as set forth above, both Jiang and Cury have a history of bench warrants. Cury also has pending state charges in both New York and Missouri and Jiang and Song were on probation during the charged conspiracy.   The factors provide additional support that these defendants' history and characteristics weight heavily in favor of detention.   See United States v. Williams, No. 20-CR-293 (WFK), 2020 WL 4719982, at *3 (E.D.N.Y. Aug. 13, 2020) (holding defendant's commission of offense while on parole weighed against release); United States v. Choudhry, 941 F. Supp. 2d 347, 359 (E.D.N.Y. 2013) ("[T]he Court may consider uncharged conduct in assessing the degree of danger posed by a defendant's release.").

D.   Danger Posed by the Defendants' Release

Finally, the risk of further violence and flight by the defendants is severe.   Courts have consistently held that where, as here, a defendant is associated with a violent criminal organization, no conditions—even stringent conditions of home confinement—are sufficient to protect the community.   See United States v. Irizzary, No. 17-CR-283 (LAP), 2020 WL 1705424, at *3 (S.D.N.Y. Apr. 8, 2020) ("Even under normal conditions, electronic monitoring does not suffice to restrain violent criminals who, like [the defendant], are members of organized gangs."); Choudhry, 941 F. Supp. 2d at 359 ("It is well established that home detention and electronic monitoring may be insufficient to protect the community against dangerous individuals, particularly where those individuals have the ability to command others to do their bidding."); United States v. Gotti, 219 F. Supp. 2d 296, 299 (E.D.N.Y.) ("In circumstances where the government has demonstrated that a defendant is a leader of an organized crime family, the Second Circuit has uniformly held that the defendant is dangerous because inherent in the leadership position is the supervision of criminal activity that cannot be curtailed by any condition or combination of conditions of release."), aff'd sub nom. United States v. Ciccone, 312 F.3d 535 (2d Cir. 2002).[6]

Here, each of the defendants poses a clear danger if released.   Not only would there be very serious danger to potential witnesses, including the many victims of the crimes

---

[6] See also United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology"); accord United States v. Brennerman, 705 F. App'x 13, 16 (2d Cir. 2017); United States v. Dono, 275 F. App'x 35, 37 (2d Cir. 2008); United States v. Kelly, No. 19-CR-286 (AMD), 2020 WL 2528922, at *3 (E.D.N.Y. May 15, 2020) ("Nor are the defendant's proposed measures—that he be kept on home confinement and monitored by pretrial services—sufficient to eliminate the danger to the community.").

detailed at length above and their families abroad, but the community at large would also be endangered.   The defendants are charged with degrading women and subjecting them to horrific violence—all to enrich themselves.   The defendants, in choosing to perpetuate, time and time again, brutal physical beatings of women in order to sustain their own criminal operation, have shown their commitment to taking any acts—including those that have had and will continue to have lasting repercussions for more than 15 separate victims—to further their own gain.   Facing serious federal charges, the defendants are likely to resort to the same violent tactics that have led to this indictment.

       For these reasons and those set forth below, the government respectfully submits this memorandum requesting the Court enter a permanent order of detention against each of the defendants.

V.    <u>Conclusion</u>

       For the reasons set forth above, the government respectfully requests that the Court enter a permanent order of detention as to each defendant pending trial.

          Respectfully submitted,

          BREON PEACE
          United States Attorney

By:         /s/
          Matthew R. Galeotti
          Kayla C. Bensing
          Sophia M. Suarez
          Assistant United States Attorneys
          (718) 254-7000

16

# APPENDIX

**CHEN ET. AL., 22-CR-158 – SUMMARY OF CHARGES BY DEFENDANT**

| Defendant | Charges | Maximum Term of Imprisonment |
|---|---|---|
| 1. Siyang Chen | <ul><li>one count of racketeering conspiracy, in violation of 18 U.S.C. §§ 1962(d) and 1963;</li><li>one count of sex trafficking conspiracy, in violation of 18 U.S.C. § 1594(c);</li><li>one count of interstate prostitution conspiracy, in violation of 18 U.S.C. § 371;</li><li>one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h);</li><li>one count of interstate prostitution, in violation of 18 U.S.C. § 2422(a);</li><li>one count of Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951;</li><li>one count of distribution of proceeds of a prostitution business, in violation of 18 U.S.C. §§ 1952(a)(1) and 1952(b)(1); and</li><li>one count of assault with a dangerous weapon in-aid-of racketeering, in violation of 18 U.S.C. § 1959(a)(3).</li></ul> | Life<br><br>(18 U.S.C. § 1594(c)) |

| Defendant | Charges | Maximum Term of Imprisonment |
|---|---|---|
| 2.  Siyu Chen | <ul><li>one count of racketeering conspiracy, in violation of 18 U.S.C. §§ 1962(d) and 1963;</li><li>one count of sex trafficking conspiracy, in violation of 18 U.S.C. § 1594(c);</li><li>one count of interstate prostitution conspiracy, in violation of 18 U.S.C. § 371;</li><li>one count of Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951;</li><li>one count of assault with a dangerous weapon in-aid-of racketeering, in violation of 18 U.S.C. § 1959(a)(3); and</li><li>one count of access device fraud, in violation of 18 U.S.C. §§ 1029(a)(5) and 1029(c)(1)(A)(ii).</li></ul> | Life<br><br>(18 U.S.C. § 1594(c)) |
| 3.  Carlos Cury | <ul><li>one count of interstate prostitution conspiracy, in violation of 18 U.S.C. § 371;</li><li>one count of Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951; and</li><li>one count of Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a).</li></ul> | 20 years (18 U.S.C. § 1951(a)) |

| Defendant | Charges | Maximum Term of Imprisonment |
|---|---|---|
| 4. Bo Jiang | • one count of racketeering conspiracy, in violation of 18 U.S.C. §§ 19962(d) and 1963;<br><br>• one count of sex trafficking conspiracy, in violation of 18 U.S.C. § 1594(c);<br><br>• one count of interstate prostitution conspiracy, in violation of 18 U.S.C. § 371;<br><br>• one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h);<br><br>• one count of Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951;<br><br>• one count of distribution of proceeds of a prostitution business, in violation of 18 U.S.C. §§ 1952(a)(1) and 1952 (b)(1);<br><br>• three counts of assault with a dangerous weapon in-aid-of racketeering, in violation of 18 U.S.C. § 1959(a)(3);<br><br>• three counts of assault with a dangerous weapon and resulting in serious bodily injury in-aid-of racketeering, in violation of 18 U.S.C. § 1959(a)(3); and<br><br>• one count of access device fraud, in violation of 18 U.S.C. §§ 1029(a)(5) and 1029(c)(1)(A)(ii). | Life<br><br>(18 U.S.C. § 1594(c)) |

| Defendant | Charges | Maximum Term of Imprisonment |
|---|---|---|
| 5. Meizhen Song | <ul><li>one count of racketeering conspiracy, in violation of 18 U.S.C. §§ 19962(d) and 1963;</li><li>one count of sex trafficking conspiracy, in violation of 18 U.S.C. § 1594(c);</li><li>one count of interstate prostitution conspiracy, in violation of 18 U.S.C. § 371;</li><li>one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h);</li><li>one count of Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951;</li><li>one count of distribution of proceeds of a prostitution business, in violation of 18 U.S.C. §§ 1952(a)(1) and 1952 (b)(1);</li><li>two counts of assault with a dangerous weapon in-aid-of racketeering, in violation of 18 U.S.C. § 1959(a)(3); and</li><li>one count of access device fraud, in violation of 18 U.S.C. §§ 1029(a)(5) and 1029(c)(1)(A)(ii).</li></ul> | Life<br><br>(18 U.S.C. § 1594(c)) |
| 6. Zerong Tang | <ul><li>one count of interstate prostitution conspiracy, in violation of 18 U.S.C. § 371;</li><li>one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); and</li><li>one count of distribution of proceeds of a prostitution business, in violation of 18 U.S.C. § 1952(a)(1)</li></ul> | 20 years<br><br>(18 U.S.C. § 1956(h)) |

| Defendant | Charges | Maximum Term of Imprisonment |
|---|---|---|
| 7. Rong Rong Xu | <ul><li>one count of racketeering conspiracy, in violation of 18 U.S.C. §§ 19962(d) and 1963;</li><li>one count of sex trafficking conspiracy, in violation of 18 U.S.C. § 1594(c);</li><li>one count of interstate prostitution conspiracy, in violation of 18 U.S.C. § 371;</li><li>one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h);</li><li>one count of distribution of proceeds of a prostitution business, in violation of 18 U.S.C. §§ 1952(a)(1) and 1952 (b)(1);</li><li>two counts of interstate prostitution, in violation of 18 U.S.C. § 2422(a);</li><li>one count of Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951;</li><li>six counts of assault with a dangerous weapon in-aid-of racketeering, in violation of 18 U.S.C. § 1959(a)(3);</li><li>three counts of assault with a dangerous weapon and resulting in serious bodily injury in-aid-of racketeering, in violation of 18 U.S.C. § 1959(a)(3); and</li><li>one count of access device fraud, in violation of 18 U.S.C. §§ 1029(a)(5) and 1029(c)(1)(A)(ii).</li></ul> | Life<br><br>(18 U.S.C. § 1594(c)) |

| Defendant | Charges | Maximum Term of Imprisonment |
|---|---|---|
| 8. Jiarun Yan | <ul><li>one count of racketeering conspiracy, in violation of 18 U.S.C. §§ 1962(d) and 1963;</li><li>one count of sex trafficking conspiracy, in violation of 18 U.S.C. § 1594(c);</li><li>one count of interstate prostitution conspiracy, in violation of 18 U.S.C. § 371;</li><li>one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h);</li><li>one count of distribution of proceeds of a prostitution business, in violation of 18 U.S.C. §§ 1952(a)(1) and 1952 (b)(1);</li><li>two counts of interstate prostitution, in violation of 18 U.S.C. § 2422(a);</li><li>one count of Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951; and</li><li>two counts of assault with a dangerous weapon in-aid-of racketeering, in violation of 18 U.S.C. § 1959(a)(3).</li></ul> | Life<br><br>(18 U.S.C. § 1594(c)) |

| Defendant | Charges | Maximum Term of Imprisonment |
|---|---|---|
| 9.  Jilong Yu | <ul><li>one count of racketeering conspiracy, in violation of 18 U.S.C. §§ 19962(d) and 1963;</li><li>one count of sex trafficking conspiracy, in violation of 18 U.S.C. § 1594(c);</li><li>one count of interstate prostitution conspiracy, in violation of 18 U.S.C. § 371;</li><li>one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h);</li><li>one count of distribution of proceeds of a prostitution business, in violation of 18 U.S.C. §§ 1952(a)(1) and 1952 (b)(1);</li><li>one count of Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951;</li><li>three counts of assault with a dangerous weapon in-aid-of racketeering, in violation of 18 U.S.C. § 1959(a)(3); and</li><li>one count of access device fraud, in violation of 18 U.S.C. §§ 1029(a)(5) and 1029(c)(1)(A)(ii).</li></ul> | Life<br><br>(18 U.S.C. § 1594(c)) |